James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey  07068
Tel:  (973) 994-1700

Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road, 6th Fl.
Ridgefield Park, New Jersey 07660
Tel: (973) 639-9100

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JORDAN ROBBINS, individually and on behalf of all others similarly situated, | Civil Action No. |
|       Plaintiffs, | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| vs. | |
| INTEL CORPORATION, | |
|       Defendant. | |

Plaintiff Jordan Robbins, on behalf of himself and all others similarly situated, on personal knowledge as to the facts concerning himself, on information and belief as to all other matters, and based on the investigation of counsel and public statements, bring this class action against Intel Corporation ("Intel" or "Defendant") pursuant to applicable state laws and allege as follows:

## I.       INTRODUCTION

1.       This case concerns Defendant's campaign to foist defective Intel x86-64x core processors ("CPUs" or "Defective CPUs") on individuals, businesses, municipalities, school

districts, universities, and other consumers throughout the United States. Consumers paid millions of dollars for Defective CPUs Intel touted as premium products using breakthrough technology that featured unmatched performance.

2. The Defective CPUs were inherently and materially defective. Defendant's CPUs suffer from a severe security vulnerability, which allows attackers to steal sensitive kernel data, including passwords and banking information.

3. While Intel has yet to come forth with a full and candid description of all facts known only to it concerning the unprecedented security vulnerability, what Intel has admitted is damning. Intel admits that the security defects affect virtually every modern computer, including smartphones, tablets and PCs from all vendors and running almost any operating system, and render the Defective CPUs unfit for their intended use and purpose. Indeed, the vulnerability is thought to affect Intel's CPUs manufactured since 1995, excluding the company's Itanium server chips and Atom processors before 2013.

4. Despite its knowledge of the Defective CPUs, Defendant has been unable or unwilling to repair the defect or offer Plaintiff and Class Members a non-defective Intel CPU or reimbursement for the cost of such Defective CPUs and the consequential damages arising the purchase and use of the CPUs. The only so-called "patch" available for this security vulnerability requires extensive changes to the root levels of the Operating System which will dramatically reduce performance of the CPUs. Worse still, while the so-called "patch" will dramatically degrade the CPUs performance, it does not completely fix the defect. The only true fix would be to exchange the Defective CPUs with a device containing a processor not subject to this security vulnerability. Plaintiff and Class Members are thus left with the unappealing choice of either purchasing a new computer containing a CPU that does not contain the defect,

continuing to use a computer with massive security vulnerabilities, or one with significant performance degradation.

5.      In short, from the moment Plaintiff and Class Members purchased their devices containing the Defective CPUs, they were an inferior, defective product that, by design and composition, did not have the qualities or properties Intel continuously represented in its sales and marketing materials.  The Defective CPUs were neither designed nor engineered to be used for the ordinary, expected purpose as high performing and secure.

6.      Intel has admitted it knew all this months ago (since at least June 1, 2017) and yet, despite the breadth and severity of the security defect, it continued to market and sell the Defective CPUs.  Defendant hid its lies and ignored its promises until the security defects were discovered and disclosed by academic and industry researchers from several countries.

7.      With sweeping, deceptive, and misleading statements, Intel induced consumers into buying devices with its Defective CPUs.  Intel sold millions of Defective CPUs in nearly all 50 states and the District of Columbia.  Intel charged a premium price for its Defective CPUs and took in millions (likely billions) in revenue on sales.  Intel's revenues for just Q3 2017 – the time period when Intel was well aware of the security defect but concealed it from the public – totaled $16.1 billion.

8.      Astonishingly, even as Intel failed to protect Plaintiff and tens of millions of other consumers, its CEO – Brian Krzanich – sold off $24,000,000.00 worth of stock and options in the company in November 2017.  The stock sale came after Intel had been informed of a significant vulnerability in its CPUs but more than a month before Intel told Plaintiff and the rest of the public.

9. Intel's actions and omissions violate well established legal and statutory duties it owed to Plaintiff and all other similarly situated United States consumers.

10. Plaintiff brings this class action on behalf of themselves and all similarly situated consumers for actual and statutory damages, as well as punitive damages and equitable relief to fully redress the vast harm Intel's wrongful acts have unleashed on United States consumers.

## II.    PARTIES

### A.    Plaintiff

11. Plaintiff Jordan Robbins is a citizen of Port Norris, New Jersey. Mr. Robbins owns a Dell XPS 8910 with an Intel i7 processor, which was purchased new on or about January 22, 2017 for over $1,300.00 from Purchasing Power, LLC at www.purchasingpower.com. Mr. Robbin's Dell XPS 8910 was covered by a written warranty. Prior to purchasing a Dell XPS 8910, Mr. Robbins viewed and heard commercials that touted Intel's long record of unmatched performance, security, and quality. Mr. Robbins uses his Dell XPS 8910 as a DJ and uses applications such as Vitual DJ Pro, FL Studio, and numerous streaming services and depends on both its performance and security. Mr. Robbins was unaware of the CPU's defect described herein prior to his purchase of this computer. Had Intel disclosed such material facts Mr. Robbins would not have purchased Dell XPS 8910 with Intel's Defective CPU or paid the price he did.

### B.    Defendant

12. Defendant Intel Corporation is a Delaware corporation with its principal place of business located at 2200 Mission College Blvd., Santa Clara, California. At all relevant times, Defendant designed, manufactured, distributed, marketed, and sold the Defective CPUs throughout the United States.

### III.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, as well as jurisdiction over the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367 because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from the Defendant.

14.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

15.    This Court has personal jurisdiction because Defendant does business in this District and a substantial part of the events and injury giving rise to Plaintiff's claims occurred in this District.

### IV.    FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

16.    Intel designed, manufactured, marketed, sold, and warranted its Defective CPUs in New Jersey and throughout the United States.  As a leader in the United States CPU industry, Intel knows the critical importance of both performance and protection of consumers' sensitive data from unauthorized access.  Intel also knows the multitude of harms that foreseeably flow to individual consumers when sensitive data is stolen by criminals, including identify theft, fraud, credit and reputational harm, erroneous tax claims, extortion, etc.

17.    Intel promoted and touted the Defective CPUs as achieving "unmatched performance" levels for consumers, servers, and workstations.  Marketing its products "as the most secure in the world", Intel also assured the public that its Defective CPUs adequately safeguarded the privacy and security of information.  Intel unreasonably and negligently failed to take appropriate steps to secure Plaintiff's and Class Members' personal identifying information.

**A.     Intel's CPUs Security Defect**

18.     Intel's Defective CPUs have a defect that is inherent within the CPU itself and/or the result of software or hardware design or manufacturing flaws.

19.     Recent news stories revealed that Intel's CPUs contain serious design defects that created severe security vulnerabilities for any device that uses Intel's CPUs.  The security flaws, named Meltdown and Spectre, were discovered by security researchers at Google's Project Zero in conjunction with academic and industry researchers from several countries.  Combined they affect virtually every modern computer, including smartphones, tablets and PCs from all vendors and running almost any operating system.

20.     Meltdown is currently thought to primarily affect Intel CPUs manufactured since 1995, excluding the company's Itanium server chips and Atom processors before 2013.  It could allow hackers to bypass the hardware barrier between applications run by users and the computer's core memory.

21.     The Spectre flaw affects most modern Intel CPUs, and potentially allows hackers to trick otherwise error-free applications into giving up secret information.

22.     Indeed, the Register reported that:

> A fundamental design flaw in Intel's processor chips has forced a significant redesign of the Linux and Windows kernels to defang the chip-level security bug…. Similar operating systems, such as Apple's 64-bit macOS, will also need to be updated – the flaw is in the Intel x86-64 hardware, and it appears a microcode update can't address it.  It has to be fixed in software at the OS level, or go buy a new processor without the design blunder.

*See*  https://www.theregister.co.uk/2018/01/02/intel_cpu_design_flaw/ (last visited January 9, 2018).

23.     Intel's security defect is material because:

> At best, the vulnerability could be leveraged by malware and hackers to more easily exploit other security bugs. At worst, the hole could be abused by programs and logged-in users to read the contents of the kernel's memory…. The kernel's memory space is hidden from user processes and programs because it may contain all sorts of secrets, such as passwords, login keys, files cached from disk, and so on. Imagine a piece of JavaScript running in a browser, or malicious software running on a shared public cloud server, able to sniff sensitive kernel-protected data.

*Id.*

24.     According to Daniel Gruss, one of the researchers at Graz University of Technology who discovered the defect, the security vulnerability found in Intel's Defective CPUs is "probably one of the worst CPU bugs ever found".

25.     Worse still, on or about January 2, 2018, it was revealed that a "patch" was available to the Meltdown vulnerability which reduces the performance of the CPUs thereby causing the CPUs to slow down from the performance specifications that Defendant promised and that Plaintiff and Class Members expected when buying a computer with an Intel CPU. The so-called "patch" requires a change to the way the operating system handles memory. The root level changes to the operating system cause substantial CPU performance degradation. Initial speed estimates predict a decrease in performance by as much as 30-50%. Spectre is harder to fix and will continue to be a significant vulnerability even with the "patch".

26.     As the Register explained, the root level changes to the operating system "separate the kernel's memory completely from user processes using what's called Kernel Page Table Isolation, or KPTI." *Id.* The impact on performance is that:

> Whenever a running program needs to do anything useful – such as write to a file or open a network connection – it has to temporarily hand control of the processor to the kernel to carry out the job. To make the transition from user mode to kernel mode and back to user mode as fast and efficient as possible, the kernel is present in

all processes' virtual memory address spaces, although it is invisible to these programs. When the kernel is needed, the program makes a system call, the processor switches to kernel mode and enters the kernel. When it is done, the CPU is told to switch back to user mode, and reenter the process. While in user mode, the kernel's code and data remains out of sight but present in the process's page tables.

Think of the kernel as God sitting on a cloud, looking down on Earth. It's there, and no normal being can see it, yet they can pray to it.

These KPTI patches move the kernel into a completely separate address space, so it's not just invisible to a running process, it's not even there at all. Really, this shouldn't be needed, but clearly there is a flaw in Intel's silicon that allows kernel access protections to be bypassed in some way.

The downside to this separation is that it is relatively expensive, time wise, to keep switching between two separate address spaces for every system call and for every interrupt from the hardware. These context switches do not happen instantly, and they force the processor to dump cached data and reload information from memory. This increases the kernel's overhead, and slows down the computer.

Your Intel-powered machine will run slower as a result.

*Id.*

27.    The security defect is material because neither Plaintiff, Class Members, nor any reasonable consumer would have purchased Intel's Defective CPUs at the price that they paid had they known or had they been told by Intel or its retail agents about the security defects prior to purchase.   It is also unprecedented in scope in that it exposes millions of Intel-based computers to critical vulnerabilities and hacking and the "patch" to cure these security vulnerabilities will result in substantial performance degradation.

**B.    Intel Knew the Defective CPUs Were Not What It Represented**

8

28.     Itel's technical and security systems were so flawed that Intel likely knew or had reason to believe that a security defect existed in its CPUs for months or even years before it finally made a public announcement.  It is clear that Intel finally made the defect public only after this unprecedented security vulnerability was discovered – by other technology companies, including Google and other research teams throughout the world.

29.     Even after Intel learned of the security defect, it unreasonably delayed disclosing the vulnerability for months, thereby increasing the exposure, risks, and injury to Plaintiff and Class Members.

30.     On January 3, 2018, Intel issued a press release and for the first time responded the news media reports concerning the unprecedented security defect in its CPUs.  In its press release, Intel admitted that it had "been made aware of new security research describing software analysis methods that, when used for malicious purposes, have the potential to improperly gather sensitive data from computing devices that are operating as designed." *See* https://newsroom.intel.com/news/intel-responds-to-security-research-findings/     (last     visited January 9, 2018).

31.     Intel failed to disclose that it had been aware of the security defects in its CPUs as early as June 1, 2017, if not far earlier.  Google said it informed Intel about the Spectre flaw on June 1, 2017 and later reported the Meltdown flaw before July 28, 2017.  Google and the security researchers it worked with said it was not known whether hackers had already exploited Meltdown or Spectre and that detecting such intrusions would be very difficult as it would not leave any traces in log files.

32.     Despite its knowledge, Intel concealed the security defect from consumers and continued marketing its CPUs as the most secure products in the world.

33.    During this delay and before the defect was made public, Intel CEO Brian Krzanich sold off a large portion of his stake in the company – $24,000,000.00 – months after Google had informed Intel of the significant security vulnerability in its flagship CPUs — but before the problem was publicly known.  The stock sale left Krzanich with just 250,000 shares of Intel stock — the minimum the company requires him to hold under his employment agreement.

34.    By withholding the facts concerning the unprecedented security vulnerability, Intel put its own interests ahead of the very consumers who placed their trust and confident in Intel and benefitted itself to the detriment of Plaintiff and Class Members.

35.    As a direct and proximate result of Intel's actions and omissions, Plaintiff and similarly situated consumers have been harmed, injured, and damaged.  Intel's Defective CPUs suffer from a defect that exposed the CPUs to critical security vulnerabilities and that proposed OS-level "patches" will slow the performance of these Defective CPUs.  Not only will any "patch" directly impact the performance of a particular user's Intel-based device, but they will have indirect performance impacts.  Countless servers that run internet-connected services in the cloud will see a dramatic degradation in performance, which will have a downstream impact to all users of these servers.  Thus, cloud-based services like Microsoft, Google, and Amazon will see substantial performance degradation.  These harms were reasonably foreseeable to Intel.

## V.    CLASS ACTION ALLEGATIONS

36.    Plaintiff bring all claims as class claims under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

37.    Plaintiff bring his claim on his own behalf, and on behalf of two proposed nationwide classes ("National Classes"), defined as follows:

    i.   <u>National Class 1</u>: All United States residents who purchased one or more x86-64x core processors from Intel or its authorized retailer sellers.

    ii.   <u>National Class 2</u>: All United States businesses, municipalities, school districts, universities, and other organizations that purchased one or more x86-64x core processors  from Intel or its authorized retailer sellers.

38.    Plaintiff also seeks to represent the following sub-classes (collectively, the "New Jersey Subclasses"), as well as any subclasses or alternative issue(s) classes as Plaintiff may propose or which  the Court may designate at the time of class certification:

    i.   <u>New Jersey Subclass 1</u>:  All residents of the State of New Jersey who purchased one or more x86-64x core processors from Intel or its authorized retailer sellers.

    ii.   <u>New Jersey Subclass 2</u>:  All businesses, municipalities, school districts, universities, and other organizations in the State of New Jersey that purchased one or more x86-64x core processors from Intel or its authorized retailer sellers.

39.    Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

40.    The National Classes and the New Jersey Subclasses are referred to, collectively, as the Classes.

41.    Excluded from the Classes are:  the Defendant; any of its corporate affiliates; any of its directors, officers, or employees; any persons who timely elects to be excluded from any of the Classes; any government entities; and any judge to whom this case is assigned and his or her immediate family, law clerks, and court staff.

42.     The Classes are so numerous that joinder of individual members thereof is impracticable.  Plaintiff believes that there are millions of members throughout the United States. The precise number and identities of Class Members are unknown to Plaintiff, but are known to Defendant or can be ascertained through discovery, using records of sales, warranty records, and other information kept by Defendant or its agents.

43.     Common questions of law and fact exist as to all members of the Classes and, as appropriate, the members of each Subclass.  The questions of law and fact common to the Classes include:

i.    Whether Defendant's CPUs are defective and the nature of that defect;

ii.   Whether and when Defendant had knowledge of the defect in its CPUs;

iii.  Whether Defendant concealed defects in its CPUs;

iv.   Whether Defendant had a duty to disclose material facts to Plaintiff and the Classes regarding defects in its CPUs;

v.    Whether Defendant's omissions regarding the CPUs were likely to deceive Plaintiff and the Classes;

vi.   Whether Defendant's alleged conduct constitutes the use or employment of an unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation within the meaning of the applicable state consumer fraud statutes;

vii.  Whether Defendant has been unjustly enriched under applicable state laws;

viii. Whether Defendant has violated its express warranties to Plaintiff and the Classes;

ix.   Whether Defendant has violated the implied warranty of merchantability under applicable state law;

x.   Whether Defendant actively concealed the security defect in order to maximize profits to the detriment of Plaintiff and the Classes;

xi.   Whether Plaintiff and the Class Members are entitled to damages, restitution, disgorgement, equitable relief, or other relief; and

xii.   The amount and nature of such relief to be awarded to Plaintiff and the Classes, including the appropriate class-wide measure of damages for the Classes.

44.    The determination of the truth or falsity of these and other questions will resolve an issue that is central to the validity of each one of the claims (depending on the cause of action asserted) in one stroke. These and other questions will need to be answered in connection with every Class Member's claim (depending on the cause of action asserted). These questions will generate common answers apt to drive the resolution of the litigation.

45.    Plaintiff's claims are typical of the claims of the absent members of the Classes because they arise from the same course of conduct by Defendant and are based on the same legal theories as do the claims of all other members of the respective Class or Subclass. Moreover, Plaintiff seeks the same forms of relief for himself as they do on behalf of absent Class Members.

46.    Plaintiff will fairly and adequately protect the interests of the absent members of the Classes. Because their claims are typical of the respective Class or Subclass that they seek to represent, Plaintiff has every incentive to pursue those claims vigorously. Plaintiff's interests are coincident with, and not antagonistic to, those of the absent members of the Classes.

13

Moreover, Plaintiff is represented by counsel competent and experienced in the prosecution of class action and, in particular, consumer protection litigation.

47.    Certification of the Classes under Rule 23(b)(3) of the Federal Rules of Civil Procedure is appropriate because the questions of law and fact common to the members of the Classes set forth in paragraph 44 above predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

48.    In addition, class action treatment under Rule 23(b)(3) is a superior method for the fair and efficient adjudication of this controversy.  Among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense if numerous individual actions.  Furthermore, although the damages suffered by members of each of the proposed Classes are substantial in the aggregate, the damages to any individual member of the proposed Classes would be insufficient to justify individually controlling the prosecution of separate actions against Defendant.  The benefits of proceeding on a class-wide basis, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any potential difficulties in managing this class action.

## VI.    CAUSES OF ACTION

**A.    Claims Brought on Behalf of the Nationwide Class.**

### COUNT I

### FRAUD AND FRAUDULENT CONCEALMENT

49.    Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

50.     Plaintiff brings this cause of action for himself and on behalf of the Nationwide Classes under the common law of fraud, which is materially uniform in all states.   In the alternative, Plaintiff brings this claim on behalf of the New Jersey Subclasses.

51.     As described above, Defendant defrauded Plaintiffs and Class Members by knowingly and intentionally concealing from them and the public at large the existence of the security flaw while representing that its Defective CPUs had superior design, security, and quality, with "unmatched" performance.

52.

53.     Defendant's concealment was deceptive and false.  Defendant knew or should have known of the security defect and  concealed the thrue nature of its chips through false statements to induce Plaintiffs and Class members to buy Defective CPUs, as well as avoid Defendant's warranty obligations, and achieve windfall profits at the expense of Plaintiffs and all Class Members.

54.     Plaintiffs and Class Members had no reasonable means of knowing that Defendant's representations were false and misleading.

55.     Defendant's actions constitute actual fraud and deceit because Defendant did the following with the intent to deceive Plaintiffs and Class Member and to induce them to enter into purchasing Defective CPUs:

        a.  Concealing the existence or possible existence of the security flaw;

        b.  Suggesting that the Defective CPUs were far superior to anything on the market with unmatched performance, security, and quality, even though it knew this to be not true; and

c. Positively asserting that the Defective CPUs were far superior to anything on the market with unmatched performance, security, and quality, in a manner not warranted by the information available to Defendant.

56. Defendant's misrepresentations were material in that they would affect a reasonable consumer's decision to purchase Defendant's Defective CPUs. Plaintiff and Class Members paid a premium for Intel CPUs precisely because they purportedly offered superior quality and performance than anything on the market. Whether Defendant's CPUs were defective would have been an important factor in Plaintiff's and the Class Members' decisions to purchase or obtain Intel CPUs.

57. Defendant's intentionally deceptive conduct induced Plaintiff's and Class Members to purchase Defective CPUs and resulted in harm and damage to them.

58. Plaintiff believed and relied to his detriment upon Defendant's affirmative misrepresentations. Class Members are presumed to have believed and relied upon Defendant's misrepresentations because those facts are material to a reasonable consumer's decision to purchase Intel CPUs.

59. Defendant also fraudulently concealed and suppressed material facts regarding the Defective CPUs. Despite knowing about the security vulnerability for months or years prior to disclosure to the public, Defendant continues to promote and tout its products as the most secure devices in the world. It knew when it marketed and sold the CPUs that the CPUs were inferior in composition and design and did not have the superior security Defendant represented, nor the superior performance Defendant claimed. Defendant failed to disclose these facts to consumers at the time they marketed and sold the CPUs. Defendant knowingly and intentionally engaged in

this concealment in order to boost sales and revenues, maintain its competitive edge in the industry, and obtain windfall profits.

60.     Plaintiff and Class Members had no reasonable means of knowing that Defendant's representations were false and misleading, or that Defendant had omitted to disclose material details relating to the Defective CPUs. Plaintiff and Class Members did not and could not reasonably discover Defendant's concealment on their own.

61.     Defendant had a duty to disclose, rather than conceal and suppress, the full scope and extent of the defects in its CPUs because:

    a.  Defendant had exclusive or far superior knowledge of the defect in the CPUs and concealment thereof;

    b.  The details regarding the defect in the CPUs and concealment thereof were known and/or accessible only to Defendant;

    c.  Defendant knew Plaintiff and Class Members did not know about the defect in the CPUs and concealment thereof and that the untrained observer would not be able to detect the inherent defects in the CPUs; and

    d.  Defendant made representations and assurances about the qualities of the CPUs, including statements about its superior performance and abilities that were misleading, deceptive, and incomplete without the disclosure of the fact that the Defective CPUs were not designed or manufactured to perform as promised.

62.     These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase Intel CPUs, and because they substantially reduced the value of the CPUs that Plaintiff's and Class Members purchased. Whether Defendant's

CPUs were defective would have been an important factor in Plaintiff's and the Class Members' decisions to purchase or obtain the CPUs.

63.    Plaintiff and the Class Members trusted Defendant not to sell them products that were defective.

64.    Defendant intentionally and actively concealed and suppressed these material facts to falsely assure consumers that the Defective CPUs were free from defects, as represented by Defendant and as reasonably expected by consumers.

65.    Plaintiff's and the Class Members were unaware of these omitted material facts and would have paid less for the CPUs, or would not have purchased them at all, if they had known of the concealed and suppressed facts. Plaintiff and the Class Members did not receive the benefit of their bargain due to Defendant's fraudulent concealment.

66.    Plaintiff's and Class Members relied to their detriment upon Defendant's reputations, fraudulent misrepresentations, and material omissions in deciding to purchase the CPUs.

67.    Defendant's fraudulent concealment was also uniform across all Class Members; Defendant concealed from everyone the true nature of the defect in the CPUs, as evinced by Defendant's CEO's stock sale during Defendant's delayed disclosure to the public.

68.    As a direct and proximate result of Defendant's deceit and fraudulent concealment, including its intentional suppression of the true facts, Plaintiff and the Classes suffered injury. They purchased Defective CPUs that had a diminished value by reason of Defendant's concealment of, and failure to disclose, the defects.

69.    Plaintiff's and the Classes sustained damages as a direct and proximate result of Defendant's deceit and fraudulent concealment in an amount to be proven at trial.

70.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights, with the aim of enriching Defendant, justifying an award of punitive damages in an amount sufficient to deter such wrongful conduct in the future.

## COUNT II

### UNJUST ENRICHMENT/QUASI-CONTRACT

71.    Plaintiff incorporate by reference all the above allegations as if fully set forth herein.

72.    Plaintiff brings this cause of action for themselves and on behalf of the Nationwide Class.  In the alternative, Plaintiff brings this claim on behalf of the New Jersey Subclasses.

73.    Plaintiff brings this claim as an alternative to the contractual warranty claims asserted below or due to Defendant's intentional and deceptive efforts to conceal the defects in the CPUs and avoid its warranty obligations.

74.    Defendant received hundreds of millions in revenue from the sale of over thousands of Defective CPUs.

75.    These millions in revenue was a benefit conferred upon Intel by Plaintiff and the Classes, which includes individuals, businesses, municipalities, school districts, universities, and other consumers across the United States.

76.    Defendant was unjustly enriched through financial benefits conferred upon it by Plaintiff and the Classes, in the form of the amounts paid to Defendant for the CPUs.

77.    Plaintiff and the Classes elected to purchase the Defective CPUs based upon Defendant's misrepresentations, deception, and omissions.  Defendant knew and understood that

it would and did receive a financial benefit, and voluntarily accepted the same, from Plaintiff and the Class when they elected to purchase the Defective CPUs.

78.    By selecting Intel's CPUs and purchasing them at a premium price, Plaintiff and the Class reasonably expected that the Defective CPUs would have the unmatched performance and security promised by Defendant.

79.    Therefore, because Defendant will be unjustly enriched if it is allowed to retain the revenues obtained through falsehoods, deception, and misrepresentations, Plaintiff and each Class Member are entitled to recover the amount by which Defendant was unjustly enriched at his or her expense.

80.    Accordingly, Plaintiff, on behalf of himself and each Class Member, seeks damages against Defendant in the amounts by which Defendant has been unjustly enriched at Plaintiff's and each Class Member's expense, and such other relief as this Court deems just and proper.

**B.    Claims Brought on Behalf of the New Jersey Subclasses.**

**COUNT III**

**VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)**

81.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

82.    Plaintiff brings this claim on behalf of themselves and the New Jersey Subclasses against Defendant.

83.    Defendant and the New Jersey Subclass Members are "persons" within the meaning of N.J. STAT. ANN. § 56:8-1(d).  The Defendant engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (d).

84.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby[.]"  N.J. STAT. ANN. § 56:8-2.

85.    In the course of his business, Defendant violated the New Jersey CFA by knowingly misrepresenting and intentionally concealing material facts regarding the performance and security of the Defective CPUs, as detailed above.  Specifically, in marketing, offering for sale, and selling the defective CPUs, Defendant engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the New Jersey CFA:

    i.   Representing that the CPUs have approval, characteristics, uses, benefits, or qualities that they do not have;

    ii.   Representing that the CPUs are of a particular standard, quality and grade when they are not;

    iii.   Failing to employ technology and systems to promptly detect security vulnerabilities;

    iv.   Unreasonably delaying giving notice to consumers after it became aware of unprecedented security defect;

    v.   Knowingly and fraudulently failing to provide accurate, timely information to consumers about the extent of the security defect and performance degradation; or

vi.  Advertising the CPUs with the intent not to sell them as advertised.

86.     Defendant's scheme and concealment of the true characteristics of the CPUs were material to the New Jersey Subclasses, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that the New Jersey Subclasses would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, the New Jersey Subclasses would not have purchased the Defective CPUs, or would have paid significantly less for them.

87.     The New Jersey Subclass Members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

88.     Defendant had an ongoing duty to the New Jersey Subclasses to refrain from unfair and deceptive practices under the New Jersey CFA in the course of its business. Specifically, Defendant owed the New Jersey Subclass Members a duty to disclose all the material facts concerning the CPUs because it possessed exclusive knowledge, it intentionally concealed it from the New Jersey Subclasses, or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

89.     The New Jersey Subclass Members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

90.     Pursuant to N.J. STAT. ANN. § 56:8-19, on behalf of the New Jersey State Clases, Plaintiff seeks an order awarding damages, treble damages, and any other just and proper relief available under the New Jersey CFA.

## COUNT IV

### BREACH OF IMPLIED WARRANTIES
### (N.J. STAT. ANN. §§ 12A:2-314, 12A:2-315)

91.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

92.    Plaintiff brings this claim on behalf of himself and the New Jersey Subclasses against Defendant.

93.    Defendant is and was at all relevant times a "merchant" with respect to the Defective CPUs under N.J. STAT. ANN. § 12A:2-104(1), and a "seller" of the Defective CPUs under N.J. STAT. ANN. § 12A:2-103(1)(d).

94.    The Defective CPUs are and were at all relevant times "goods" within the meaning of N.J. STAT. ANN. § 12A:2-105(1).

95.    A warranty that the CPUs were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to N.J. STAT. ANN. § 12A:2-314.

96.    In addition, a warranty that the CPUs were fit for their particular purpose is implied by law pursuant to N.J. STAT. ANN. § 12A:2-315.  Defendant knew at the time of sale of the CPUs that the New Jersey Subclasses intended to use the CPUs requiring a particular standard of performance and security, and that the New Jersey Subclasses were relying on Defendant's skill and judgment to furnish suitable products for this particular purpose.

97.    The Defective CPUs, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above.  In addition, because any warranty repairs or replacements offered by Defendant cannot cure the defect in the CPUs, they fail to cure Defendant's breach of implied warranties.

98.    As a direct and proximate result of Defendant's breach of its implied warranties, the New Jersey Subclass Members have been damaged in an amount to be determined at trial.

99.    Defendant was provided notice of the issues raised in this Count and this Complaint as detailed above.

WHEREFORE, Plaintiff, individually and on behalf of the members of the Nationwide and New Jersey Subclasses, respectfully request that the Court certify the proposed Nationwide and New Jersey Subclasses, including designating the named Plaintiff as representative of the Nationwide Class and the New Jersey Subclass and appointing the undersigned as Class Counsel under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in favor and against Defendant including the following relief:

A.    An award of restitution, compensatory damages, and costs for economic loss and out-of-pocket costs;

B.    An award of punitive and exemplary damages under applicable law;

C.    A determination that Defendant is financially responsible for all Class notices and the administration of class relief;

D.    An award of any applicable statutory or civil penalties;

E.    An order requiring Defendant to pay both pre-judgment and post-judgment interest on any amounts awarded;

F.    An   award  of  reasonable  counsel  fees,  plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for the fees of  experts

G.    Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

H.    Any such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, of all issues so triable.

Dated: January 12, 2018

**CARELLA, BRYNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.**

s/ James E. Cecchi
JAMES E. CECCHI

DONALD A. ECKLUND
MICHAEL A. INNES
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: (973) 994-1700

**SEEGER WEISS LLP**
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
CRISTOPHER L. AYERS
55 Challenger Road, 6th Fl.
Ridgefield Park, New Jersey 07660
Tel: (973) 639-9100